STATE OF NORTH CAROLINA v. WILLIAM AUNDRA ALFORD

No. 361A89

(Filed 5 September 1991)

**1. Homicide § 21.5 (NCI3d) — first degree murder — premeditation and deliberation — evidence sufficient**

The trial court did not err in a first degree murder prosecution by denying defendant's motion to dismiss the charge based on premeditation and deliberation for insufficient evidence where there was plenary evidence of premeditation and deliberation and substantial evidence from which the jury could infer that defendant was the sole perpetrator of the murder.

**Am Jur 2d, Homicide § 439.**

**2. Homicide § 21.6 (NCI3d) — felony murder — evidence sufficient**

The evidence was sufficient to support defendant's conviction for first degree murder based on felony murder where the evidence was sufficient to show that the killing occurred during the perpetration of a robbery and sufficient for the jury to infer that it was defendant who alone perpetrated the murder while robbing his victim.

**Am Jur 2d, Homicide §§ 435, 442.**

APPEAL of right pursuant to N.C.G.S. § 7A-27(a) from a conviction of murder in the first degree and a judgment imposing a sentence of life imprisonment entered by *Friday, J.,* at the 22

**STATE v. ALFORD**

[329 N.C. 755 (1991)]

May 1989 criminal session of the Superior Court, ROBESON County. Heard in the Supreme Court 6 September 1990.

*Lacy H. Thornburg, Attorney General, by Charles M. Hensey, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Staples Hughes, Assistant Appellate Defender, for defendant-appellant.*

EXUM, Chief Justice.

Following trial as a capital case, defendant was found guilty of murder in the first degree based upon theories of premeditation and deliberation and felony murder. After a capital sentencing hearing, he was sentenced to life imprisonment. The single issue before this Court is whether the evidence was sufficient to support the jury's verdict on either theory. We determine that it was sufficient on both theories.

I.

Evidence presented by the State included the testimony of numerous witnesses and the narrative of a recorded interview of defendant by investigating officers. This evidence tended to show as follows:

During the spring and summer of 1987, defendant had been employed by David Younts, Jr., to mow grass at the latter's home and at his oil business. Defendant worked at the business premises between 2 o'clock and 5 o'clock on Saturday, 11 July 1987. Both defendant and Younts were still there when Mrs. Younts left work around 5 p.m.

Around 9:15 p.m. on 11 July 1987, Mrs. Younts returned home from Fayetteville, where she had been babysitting her grandchildren. She observed the light was on in an unoccupied upstairs bedroom and her husband was not watching television in the den. She went upstairs and found her husband lying on the floor of their bedroom, holding a gun. She noticed a gun case sticking out of an open dresser drawer, but nothing else in the room appeared to be disturbed. Mrs. Younts immediately went back downstairs and called the emergency number. Later that evening she noticed that a glass bowl by the telephone, ordinarily full of coins, was empty.

Both rescue squad personnel and police officers responded to Mrs. Younts' call. Investigators observed the doors to both the

master bedroom and a bedroom across the hall were open and blood was spattered across the wall, a television stand and the dresser and mirror in the master bedroom. Mr. Younts was lying in front of the television with one foot against the stand. Several wounds were apparent on the side of his head. An autopsy revealed several lacerations on his head, including one behind the ear that had penetrated his skull. A bone chip was missing from that portion of his skull. The wound, which could have rendered the victim unconscious, must have been caused by a blow from a blunt object. Although this blow might eventually have caused death, the immediate cause of death was the bullet from a single gunshot wound, which entered the left ear canal and lodged in the right base of the skull. Which wound was first inflicted could not be determined.

The gun recovered from the victim's hand and identified as belonging to the victim had no identifiable fingerprints but his own. The victim kept the gun, loaded, in the second or third drawer of a dresser in the master bedroom. A metal shoe repair stand, located under a crib in the unoccupied bedroom across from the master bedroom, bore dark stains determined to have been caused by blood consistent with the victim's blood in type. The stand ordinarily had been stored in the basement. Bloody leather gloves and a bloody shirt were also found in the spare bedroom, but tests comparing these bloodstains to the victim's blood type were inconclusive.

The victim collected "anything antique," including old currency, musical instruments, and guns. He collected "old coins, silver dollars and Kennedy halves that were real silver," as well as two-dollar bills and silver certificates. His coin collection, which he kept in the bedroom closet, was discovered missing the day after he died. His billfold, which emergency medical personnel had removed from his pocket and placed in a dresser drawer, contained only one dollar. He habitually carried much more cash in his billfold.

Defendant visited Desmond Edwards, his girlfriend's brother, around 9:30 p.m. on 11 July 1987. He exhibited a "wet" roll of $100 bills and some two-dollar bills and gave Edwards ten dollars' worth of silver half-dollars. Defendant gave his girlfriend's sister, Belinda, some half-dollars. After defendant had distributed the coins, Edwards, defendant, a cousin, and "a dude named Charlie" drove to Burger King, where defendant treated everyone to food, paid for with "dollars." The four then drove to South Carolina to "party"

at a club, where defendant again paid for everything. They returned to Lumberton at 5 a.m. and went to a restaurant at a mall, where defendant again paid for food for everyone with silver currency.

Desmond Edwards saw defendant with a car for the first time on the Monday after July 11th. Defendant told Desmond he had bought the car with a check he got through the housing authority, where defendant was working. Defendant, after test-driving a Mercury Cougar at Benton's Used Cars on Monday afternoon, 13 July 1987, returned after dinner time and purchased it for $1,000 in what one employee described as "red-looking" bills.

One week after Younts' death, defendant drove by the Younts' house with companions and asked if they wanted to go in. Defendant told them there were "some old drums and guitars" in the basement, as well as "a lot of antique stuff."

Officers who conducted a consensual search of defendant's car on 3 August 1987 found a silver money clip, identified as being a souvenir the Younts had brought back from Mexico; a knife, a coin wrapper, and a wallet — all identified as having belonged to the victim. A ring, also identified as the victim's, was pawned by defendant on 17 July 1987.

Defendant's pretrial statement to investigators was offered against him at trial. According to this statement, defendant met a black male named "Johnny" at approximately 6 p.m. on 11 July 1987, when he left Younts' business premises. Johnny wanted to go to Younts' house and rob him. The two arrived at Younts' residence at approximately 6:30 or 7 p.m. Johnny had a revolver. The plan was for Johnny to go inside and wait for Younts to get home. Defendant was to remain outside as a lookout and to whistle if anyone came. Defendant saw Younts arrive home and go in the back door. Ten or fifteen minutes passed, and defendant heard a gunshot. After another ten or fifteen minutes, Johnny emerged from the house with a handful of bloody money, a pocketful of jewelry and a paper bag containing rolls of coins. Johnny gave defendant approximately $1,200 in one-hundred dollar bills, the bag of coins, an envelope containing several two-dollar bills and a silver money clip. Johnny kept approximately $2,000 and all the jewelry. Defendant took his bills to the river and washed the blood off. He swam across the river and walked to his girlfriend's house. Johnny told defendant he left the gun in Mr. Younts' hand to make his death look like suicide. Defendant spent his $1,200 on

STATE v. ALFORD

[329 N.C. 755 (1991)]

a car and things at the mall and gave everyone at his girlfriend's house some of the silver coins. Defendant denied ever having been in the Younts house.

Defendant was served with a search warrant at the Robeson County Jail on 3 August 1987. The warrant named the items being sought, including a pair of white knit shoes. When told what was wanted, defendant said, "these ain't the shoes I wore when the crime was done. They were nowhere around."

Following his interrogation by police officers, defendant pointed out "Johnny's" picture in their high school yearbook as that of Johnny Thompson. Thompson was located and interrogated. At defendant's trial Thompson testified he knew defendant from high school only because defendant had talked to his cousin from time to time. He denied he and defendant were friends, and he denied having ever seen defendant socially or for any other reason on 11 July 1987. On the evening of 11 July he had been with a close friend. The friend and Thompson's mother corroborated Thompson's testimony.

## II.

[1] Defendant's motion at the close of evidence to dismiss the charge of murder in the first degree for insufficiency of the evidence was denied. Defendant's motion following the jury instructions that the felony murder theory of guilt be withdrawn from the jury's consideration was also denied. Defendant assigns error to these rulings.

In measuring the sufficiency of the evidence, the reviewing court must consider the evidence in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *E.g., State v. Sumpter,* 318 N.C. 102, 107, 347 S.E.2d 396, 399 (1986). A case is properly submitted to the jury when "there is any evidence that tends to prove the fact in issue or that reasonably supports a logical and legitimate deduction as to the existence of that fact." *State v. Artis,* 325 N.C. 278, 301, 384 S.E.2d 470, 483 (1989), *vacated on other grounds,* --- U.S. ---, 108 L. Ed. 2d 604 (1990). If the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as its perpetrator, the motion to dismiss should be allowed. *State v. Lynch,* 327 N.C. 210, 215, 393 S.E.2d 811, 814 (1990). If the record discloses substan-

tial evidence of each essential element constituting the offense for which the accused was tried and that defendant was the perpetrator of that offense, then the trial court's denial of a motion to dismiss for evidentiary insufficiency should be affirmed. *State v. Lynch*, 327 N.C. at 215, 393 S.E.2d at 814; *State v. Artis*, 325 N.C. at 301, 384 S.E.2d at 482. " 'Substantial evidence' is that amount of relevant evidence that a reasonable mind might accept as sufficient to support a conclusion." *State v. Artis*, 325 N.C. at 301, 384 S.E.2d at 483 (quoting *State v. Corn*, 303 N.C. 293, 296, 278 S.E.2d 221, 223 (1981)).

When a defendant is tried for murder in the first degree based upon premeditation and deliberation, substantial evidence must be before the jury that defendant killed his victim with malice, premeditation, and deliberation. *State v. Artis*, 325 N.C. at 302, 384 S.E.2d at 483; *State v. Corn*, 303 N.C. at 296, 278 S.E.2d at 223. "The intentional use of a deadly weapon gives rise to the presumption that the killing was unlawful and that it was done with malice. A pistol is a deadly weapon *per se.*" *State v. Bullard*, 312 N.C. 129, 160, 322 S.E.2d 370, 388 (1984). "Premeditation means that the act was thought out beforehand for some length of time, however short . . . . Deliberation means an intent to kill carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *State v. Brown*, 315 N.C. 40, 58, 337 S.E.2d 808, 822 (1985) (citations omitted), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds*, *State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). "Because premeditation and deliberation relate to mental processes and ordinarily are not readily susceptible to proof by direct evidence, they usually must be proved by circumstantial evidence." *State v. Davis*, 325 N.C. 607, 628, 386 S.E.2d 418, 429 (1989), *cert. denied*, --- U.S. ---, 110 L. Ed. 2d 268 (1990); *State v. Jackson*, 317 N.C. 1, 23, 343 S.E.2d 814, 827 (1986), *vacated on other grounds*, 479 U.S. 1077, 94 L. Ed. 2d 133 (1987).

"Generally speaking, circumstantial evidence is evidence of a fact from which other facts may be logically and reasonably deduced." *Phelps v. Winston-Salem*, 272 N.C. 24, 28, 157 S.E.2d 719, 722 (1967).

When as here the motion to dismiss puts into question the sufficiency of circumstantial evidence, the court must decide

whether a reasonable inference of the defendant's guilt may be drawn from the circumstances shown. If so the jury must then decide whether the facts establish beyond a reasonable doubt that the defendant is actually guilty.

*State v. Lynch*, 327 N.C. at 216, 393 S.E.2d at 814 (quoting *State v. Triplett*, 316 N.C. 1, 5, 340 S.E.2d 736, 739 (1986)). This Court has recognized several circumstances that may indicate a killing was effected with premeditation and deliberation. *See, e.g., State v. Small*, 328 N.C. at 181-82, 400 S.E.2d at 416; *State v. Davis*, 325 N.C. at 628-29, 386 S.E.2d at 429; *State v. Jackson*, 317 N.C. at 23, 343 S.E.2d at 827; *State v. Bullard*, 312 N.C. at 161, 322 S.E.2d at 388. Those presented by the evidence in this case are the absence of provocation by the deceased, lethal blows dealt after the victim had been felled and rendered helpless, the nature and number of the victim's wounds, and the conduct and statements of the defendant after the killing.

There was plenary evidence in this case of malice, premeditation, and deliberation. That the metal shoe repair box had been stored in the basement and was found upstairs stained with the victim's blood permits an inference that the perpetrator entered the basement, scanned its contents, seized the box, and mounted the stairs with the intention of using the box as a weapon. The position of the victim's body on the floor in front of the television set in the master bedroom and the absence of signs of physical struggle permit an inference that the perpetrator approached the victim unperceived and unprovoked and hit him about the head with the shoe stand, inflicting at least one blow sufficiently deep to cause unconsciousness. From the foregoing and the gunshot wound into the victim's left ear canal, causing death, it is reasonable to infer that the gunshot wound was inflicted after the victim was felled and unconscious. The perpetrator's subsequent search through the room was evident in the gaping dresser drawers and missing coins and jewelry.

We also conclude that there was substantial evidence from which the jury could infer that defendant was the sole perpetrator of the murder.

The credibility of the witnesses, the weight of the testimony, and conflicts in the evidence are matters for the jury to consider and pass upon. *See Atkins v. Moye*, 277 N.C. 179, 186, 176 S.E.2d

789, 794 (1970); *Will of Bergeron*, 196 N.C. 649, 653, 146 S.E. 571, 573 (1929).

If the jury believed Johnny Thompson's testimony, corroborated by his friend and his mother, that he had not been with defendant at any time on 11 July 1987, then all other evidence points directly to defendant as the perpetrator of the robbery and murder. He was seen in possession of notable quantities of silver currency and rare two-dollar bills, as well as a "roll" of hundred-dollar bills. He spent money liberally over the two days after the murder, including buying a car for the first time. The car was purchased not only with cash, but with bills the salesperson described as "red-looking." Defendant possessed shortly after the murder various personal items belonging to the victim. Although these possessions were consistent with defendant's pretrial statement describing Johnny Thompson as the perpetrator who shared his booty with defendant, the jury was free to disbelieve this statement in light of Thompson's testimony and to accept Thompson's testimony as the truth. "Any contradictions or discrepancies in the evidence are for resolution by the jury." *State v. Brown*, 310 N.C. 563, 566, 313 S.E.2d 585, 587 (1984). The State is not bound by a pretrial, exculpatory statement of a defendant which it offers into evidence if there is other evidence in the case tending to show otherwise. *State v. Wheeler*, 321 N.C. 725, 728, 365 S.E.2d 609, 611 (1988); *State v. Primes*, 314 N.C. 202, 216-17, 333 S.E.2d 278, 287 (1985).

Further evidence that defendant himself was the perpetrator of the murder was the testimony that he knew the contents of the Younts basement and suggested to his girlfriend's brothers only a week after the murder that they go in to see the guitars and drums and "antique stuff."

We conclude that, "[e]ven if each of these circumstances standing alone would be insufficient to raise more than a mere suspicion of defendant's guilt, all the circumstances taken together are clearly sufficient to permit the jury to find beyond a reasonable doubt that defendant perpetrated the murder, and that he did so with premeditation and deliberation." *State v. Lynch*, 327 N.C. at 216-17, 393 S.E.2d at 815 (citations omitted). We hold that, viewed in the light most favorable to the State, the evidence was sufficient to withstand defendant's motion to dismiss the charge of murder based on premeditation and deliberation because it was substantial as

to each element of the offense as well as to the identity of the perpetrator.

[2]  When a defendant is tried for murder in the first degree on the basis of felony murder, substantial evidence must be before the jury that the victim was killed "in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon." N.C.G.S. § 14-17 (1986).

Defendant notes that the trial court did not instruct the jury on acting in concert; and, he argues, the evidence was insufficient to support a felony murder except on an acting in concert theory. Therefore, he says, the trial court erred in denying his motion made after the jury instructions to withdraw the felony murder theory of guilt from the jury's consideration. Having determined the evidence was sufficient to support defendant's guilt of murder in the first degree on a theory of premeditation and deliberation, we need not address this argument. The verdict convicting defendant on that theory alone is fully sufficient to support the judgment of the trial court.

We are nevertheless confident that the evidence was amply sufficient to support defendant's conviction of first-degree murder on a felony murder theory. Defendant's pretrial statement is sufficient to show that the killing occurred during the perpetration of a robbery. See State v. Wooten, 295 N.C. 378, 385, 245 S.E.2d 699, 704 (1978). But in the absence of an instruction on acting in concert, "the State had to satisfy the jury that each defendant committed every element in the [charged] offense in order to obtain a conviction for all . . . defendants." State v. Cox, 303 N.C. 75, 86, 277 S.E.2d 376, 383 (1981).

The evidence, as we have shown, is such that the jury could reasonably infer it was defendant, not Thompson, who alone perpetrated the offense of murder while engaged in robbing his victim.

For the reasons stated, we find in defendant's trial

No error.